**SEALED AND HSD**

AAS:EJD
F. #2021R00184

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

FAN "FRANK" LIU,
MATTHEW ZIBURIS and
QIANG "JASON" SUN

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

C O M P L A I N T

(18 U.S.C. §§ 371, 1028(a)(7), 1028(b)(2)(B), and 1028(c)(3)(A))

No. 22-MJ-257

EASTERN DISTRICT OF NEW YORK, SS:

KEVIN PATRICK MINTON, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

In or about and between January 2021 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FAN "FRANK" LIU and MATTHEW ZIBURIS, together with others, did knowingly and willfully conspire to act in the United States as agents of a foreign government, to wit: the People's Republic of China, without prior notification to the Attorney General of the United States, as required by law, contrary to Title 18, United States Code, Section 951(a).

(Title 18, United States Code, Section 371)

On or about and between January 2021 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FAN "FRANK" LIU, MATTHEW ZIBURIS, and QIANG "JASON" SUN, together with others,

SEALED AND HSD

did knowingly and willfully conspire to travel in interstate and foreign commerce, with the intent to harass and intimidate one or more persons, to wit: dissidents from the People's Republic of China residing in the United States and elsewhere, and in the course of, and, as a result of such travel, engaged in conduct that caused, attempted to cause and was reasonably expected to cause the dissidents substantial emotional distress, contrary to Title 18, United States Code, Section 2261A(1)(B).

(Title 18, United States Code, Section 371)

On or about and between January 2021 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FAN "FRANK" LIU, MATTHEW ZIBURIS, and QIANG "JASON" SUN, together with others, did knowingly and intentionally transfer, possess and use, without lawful authority and in and affecting interstate and foreign commerce, one or more means of identification of another person, to wit: telephone numbers and other contact information belonging to one or more U.S.-based Chinese dissidents, with the intent to commit, and aid and abet, and in connection with, unlawful activity that constituted one or more violations of Federal law, to wit: acting as an agent of a foreign government without prior notification to the Attorney General, in violation of Title 18, United States Code, Section 951(a).

(Title 18, United States Code, Sections 1028(a)(7), 1028(b)(2)(B), and 1028(c)(3)(A))

In or about and between January 2021 and March 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FAN "FRANK" LIU and QIANG "JASON" SUN, together with others, together with others, did knowingly and willfully conspire to commit an offense against the United States, to wit: to offer

SEALED AND HSD

3

and promise an employee of the Internal Revenue Service a bribe payment with the intent to induce the employee to do any act in violation of the lawful duty of such employee, to wit: the unlawful dissemination of a Chinese dissident's tax return, contrary to Title 18, United States Code, Section 201(b)(1)(C).

> (Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). Since becoming a Special Agent, I have participated in numerous investigations into organized criminal activity, during which I have, among other things: (a) conducted physical and electronic surveillance, (b) reviewed search warrant returns, (c) reviewed and analyzed recorded conversations and records, and (d) debriefed cooperating witnesses and informants.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and reports of other law enforcement officers involved in the investigation.

## PROBABLE CAUSE

2.      The investigation has revealed that the defendants FAN "FRANK" LIU, MATTHEW ZIBURIS, and others, have agreed to act as agents of the government of the People's Republic of China ("PRC") without prior notification to the Attorney General.   LIU, ZIBURIS, and others have acted to gather derogatory information about PRC dissidents located in the United States and to publicly discredit the dissidents.   QIANG "JASON" SUN, who is based in the PRC

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

SEALED AND HSD
4

and appears to act as an intermediary for the PRC government, has provided taskings to LIU to perform as to various U.S.-based dissidents of Chinese descent.

I.      The Defendants

        3.      FAN "FRANK" LIU is a resident of Jericho, Long Island, who was born in the PRC.   LIU is President of entities called Congress Web TV Station and the World Harmony Foundation.    According to open-source information, LIU has held multiple positions with international organizations, programs, and campaigns in which he has interacted with high-level PRC government officials.    LIU has not notified the Attorney General that he is acting as an agent of the PRC government.    LIU is depicted below.



        4.      MATTHEW ZIBURIS previously resided in Ocala, Florida and currently resides in Oyster Bay, Long Island.   He has worked as a correctional officer for the State of Florida and as a bodyguard.   ZIBURIS has not notified the Attorney General that he is acting as an agent of the PRC government.   ZIBURIS is depicted below.

SEALED AND HSD
5



5.      QIANG "JASON" SUN is a PRC-based employee of an international technology company headquartered in the PRC.   SUN, who is a PRC national, appears to act as an intermediary between the PRC government and LIU.   SUN is depicted below.



II.      Regulations for Agents of Foreign Governments

6.      An individual who acts in the United States as an agent of a foreign government is required to provide prior notification to the Attorney General, under the rules and regulations established by the Attorney General.   See 18 U.S.C. § 951(b); 28 C.F.R. §§ 73.1 et seq.

7.      The term "agent of a foreign government" includes an individual who agrees to operate within the United States subject to the direction and control of a foreign government or official.   See 18 U.S.C. § 951(d).

SEALED AND HSD
6

III.    Background of the Investigation

8.     As detailed below, the defendants have been engaged in an ongoing transnational repression operation to disseminate negative publicity about anti-Chinese Communist Party ("CCP") activists located on U.S. soil, by harassing them and attempting to discredit them in the eyes of the U.S. and international public.

*LIU Contacts the Investigator*

9.     In or about January 2021, LIU approached a private investigator based in the Eastern District of New York (the "Investigator") about performing comprehensive due diligence investigations on two individuals.   Both individuals are anti-CCP pro-democracy activists born in the PRC and who reside in the United States.   In a January 10, 2021 email to the Investigator, LIU wrote to request "detail personal information which is not too difficulty .   They are famous in community." [2]   As to each of the dissidents, LIU requested the following information:

    1) His personal detail profile
    2) HIs home address
    3) His phone number
    4) His family members
    5) HIs company detail information,
    6) What business they are do ing ?
    7) How many members and partners around him , who in his company and these people's profile ?
    8) who are His assistant and his house keeper name

10.     In early- to mid-January 2021, the Investigator agreed to provide the services requested at a cost of $1500 per report to be delivered by January 18, 2021.   The reports ultimately delivered to LIU contained open-source information about the dissidents' anti-CCP

_____

[2]     All citations to electronic communications include original punctuation, grammar, and spelling.

SEALED AND HSD

7

activities and included their home addresses and contact information.    LIU compensated the Investigator through a digital payment application.

11.    In subsequent oral and written communications with the Investigator on January 10 and 11, 2021, LIU claimed that he belonged to the International Chamber of Commerce and was an Advisor to the "International Police Foundation."[3]    He further claimed that he was performing due diligence work for an unnamed client in the PRC engaged in litigation involving the dissidents.    On January 21, 2021, LIU requested Internal Revenue Service ("IRS") reports on certain dissidents and asked the Investigator whether he had contacts with the FBI or the Central Intelligence Agency.    However, the Investigator did not respond, concerned that the requests were from the PRC government.    Thereafter, the Investigator contacted the FBI and provided all prior written communications with LIU to the FBI.

12.    In further communications, LIU revealed to the Investigator that he had hired a bodyguard in Florida (referring to ZIBURIS) to complete reports on 13 individuals and suggested that the Investigator retain the bodyguard to assist the Investigator in obtaining information on the dissidents.    In particular, in a January 22, 2021 text to the Investigator, LIU sought the phone number, address, license plate, Social Security number, resume, background, professional expertise, address, family situation, contacts, relationship with U.S. politics, and any "bad behavior towards China (it will be risky to cooperate with them)" of the following individuals that worked for a specific human rights non-governmental organization ("NGO") based in Washington, D.C., that advocates for democratic reform in the PRC: the Chief Financial Officer, the Legal Counsel, the Director, the Manager, and any assistants to these principals.

---

[3]        It is unclear to what organization LIU was referring.

SEALED AND HSD

13.     In a February 6, 2021 text to the Investigator, LIU provided ZIBURIS's contact information and stated, "The young man do good job for me / Could you call him?"   On February 5, 2021, LIU sent an email to the Investigator, copying ZIBURIS.   LIU introduced ZIBURIS to the Investigator and suggested that the Investigator hire ZIBURIS as his "FL agent."

14.     Though the Investigator did not ultimately hire ZIBURIS, he agreed to meet with LIU and ZIBURIS.   On or about July 22, 2021, the Investigator met with LIU and ZIBURIS at an office located in the Eastern District of New York.   The meeting was recorded, and I have reviewed the recording.   In sum and substance and in part, LIU discussed how the PRC government conducts cross-border operations generally and why people like himself investigate U.S.-based persons on behalf of the PRC government as agents or intermediaries, as opposed to PRC government officials themselves carrying out operations within the U.S.   For example, LIU explained:

> A lot of those countries some clients, some rich people, some politician, they want to investigate.   A lot of people come here, they investigate these people some take their money they come here try to chase the money.
>                               * * *
> That's huge market, no just China but also other countries.   Any kind of scam or corruption.   These government willing to chase.   We don't care which party you are we don't care.   We care give us job, pay us, and we investigate these guys dead wrong, where is it get you, that's it.   We don't involve in political.   We just do our tactical part.

15.     LIU also acknowledged to the Investigator that LIU was receiving taskings from a company—in an apparent reference SUN's company—that was acting on behalf of the PRC government ("[B]usiness people if it looks good the government will like it.   If the government likes it they can get better business.   They want to do something to pull up money to hire you to do something and the government is happy. . . . [W]e just deal with the company, we don't direct deal with government.   We don't want to touch the political.").   When asked by the

SEALED AND HSD

Investigator why LIU worked with a company rather than with the PRC government directly ("So

what do they do then do they go through a Chinese company to hire us to do it?"), LIU responded:

> Yes, yes a lot of company because they want to do something good to government.
> So they help them just like we're an NGO we do something good for the UN . . .
> business people if it looks good the government will like it.  If the government
> likes it they can get better business.  They want to do something to pull up money
> to hire you to do something and the government is happy.

*The Defendants' Efforts to Obtain Dissident 1's Tax Returns*

16.     In late January 2021, LIU repeatedly asked the Investigator to obtain the

U.S. federal tax returns of a visual artist located in Southern California ("Dissident 1").   Dissident

1 is a PRC national whose artwork is critical of the PRC government and the CCP.   As discussed

below, LIU's purpose in obtaining the tax returns was to publicly disseminate any tax liabilities

by Dissident 1, to publicly discredit him.

17.     On or about January 21, 2021, LIU sent an email to the Investigator

forwarding what appears to be chat messages with the person directing LIU's activities.   In

pertinent part, LIU's handler (determined to be SUN based on electronic communications

uncovered by the investigation between SUN and LIU) instructed LIU that the due diligence

reports from the Investigator lacked sufficiently detailed information and requested "Tax form

2019 till 2020" as well as "Derogatory information from former business associates," such as "their

Family situation; Background situation; The more detailed the better."   Similarly, on March 1,

2021, LIU emailed the Investigator whether he could find "a target's SS #" (another reference to

Dissident 1) and use that information to "find out his 2 years tax return."

18.     LIU also sought to obtain Dissident 1's tax returns through ZIBURIS, who

was planning to meet with Dissident 1 while posing as a potential client (discussed in further detail

below).   On February 28, 2021, LIU wrote ZIBURIS, "pls google [] check who is best IRS

SEALED AND HSD

10

consultant can retr[ieve] his tax report from 2018-2020 if we get his SS #?"   ZIBURIS responded,

"Cannot get his taxes unless we can get into his email account."   LIU replied, "How you can smart

to let him give you tax info when you meet him?"   I believe LIU was asking ZIBURIS whether,

when ZIBURIS met Dissident 1, he could persuade Dissident 1 to provide Dissident 1's tax

information.   Indeed, other communications in the chat suggest that ZIBURIS planned to assume

the role of an art broker in meeting Dissident 1 (who, as mentioned above, is a visual artist), so

that ZIBURIS could determine for "the boss" (a likely reference to SUN) the locations of Dissident

1's art installations and exhibitions.   ZIBURIS noted that he could "ask if I could see them as

proof of sales he claimed in the past and its for negotiations only."   LIU responded, "Good, it's

better get his tax returns past two years!"

19.   On or about March 2, 2021, the Investigator participated in a consensually

monitored phone call with LIU.   In pertinent part, LIU reiterated his request for Dissident 1's tax

return information.   After the Investigator indicated that obtaining tax returns would be illegal,

LIU indicated that he understood and wished to proceed forward anyway.   LIU also indicated that

his client (a likely reference to SUN) would also wish to proceed notwithstanding the illegality of

the request.

20.   On or about March 4, 5 and 6, 2021, the Investigator participated in a series

of consensually monitored calls with LIU, where LIU reiterated his requests for the tax return

information.   During the March 4, 2021 call, LIU stated that he would email the Investigator the

information for the individual whose tax returns he wanted to obtain.   The Investigator reiterated

to LIU that this was illegal, and LIU responded "okay."   The Investigator then told LIU that he

would find out the cost to LIU of obtaining the tax returns.   On that same date, LIU emailed the

Investigator the personal identifying information for Dissident 1—the individual whose tax returns

SEALED AND HSD

11

LIU was seeking.  During the March 5, 2021 call, the Investigator claimed to have a contact at the IRS who could illegally provide the tax returns for $3,500.   In actuality, the Investigator did not have a contact at the IRS but made the claim at the direction of the FBI.   In response, LIU stated that he needed two years of Dissident 1's tax returns.  During the March 6, 2021 call, the Investigator indicated that LIU would have to provide $1,500 by the following Monday, March 8, 2021, for the Investigator's purported contact at the IRS to begin the work of obtaining the tax returns.   LIU agreed to provide $1,500 to the Investigator by that Monday.

21.     On Monday, March 8, 2021, LIU sent the Investigator an email stating, in part, "Now, not need IRS till the boss [SUN] want it."   LIU again inquired about the cost and LIU and the Investigator exchanged emails about the total cost and the $1,500 deposit.   On March 11, 2021, the Investigator wrote via email to LIU that "[the IRS contact] needs the retainer payment of $1,500 before he starts.   I need to [give] it him [in] cash due to the sensitivity of this request so I would need payment from you first."   On March 11, 2021, LIU replied and confirmed that he wanted the Investigator to get the tax returns and stated that he would use a digital payment application to transfer $1,500 to the Investigator.

22.     On March 11, 2021, the Investigator emailed LIU an invoice for the "retainer payment of $1500.00 for the IRS document search for [Dissident 1]."   LIU replied, "Thank you , I got , will pay on Sunday !"

23.     On March 15, 2021, Congress Web TV Station Inc.—LIU's company— transferred $1,500 to the Investigator via a digital payment application.   Text messages between LIU and the Investigator corroborate LIU's payment of $1500 to the Investigator.   LIU sent a text message with a screenshot of the transfer to the Investigator and then a text message with the word "Action?"   The Investigator responded, "I am paying the contact at the IRS cash tomorrow.   Then

SEALED AND HSD

he will begin working on the files.  Let your boss know it will be a few days."  LIU replied,

"Thank you.   We are not rush but hope this week."

24.     Later in March 2021, at the direction of the FBI and with the consent of

Dissident 1, the Investigator provided copies of the two tax returns for Dissident 1's company to

LIU.   As discussed further below, an undated document from LIU to SUN discusses the

coconspirators' ultimate purpose in obtaining the tax returns: "Based on his high price quotes for

his [Dissident 1's] artwork, we believe he definitely took in a large sum and evaded taxes, a major

crime in the U.S.   After obtaining evidence, spend money for court and attorney fees to totally get

rid of him."

*Additional Targeting of Dissident 1*

25.     In addition to seeking Dissident 1's tax returns, the defendants performed

surveillance on Dissident 1 by meeting with Dissident 1 under false pretenses, photographing and

videotaping Dissident 1 with his artwork, and installing surveillance equipment on Dissident 1's

vehicle and at his studio.

26.     Beginning in or about late February 2021, LIU and ZIBURIS discussed

purchasing spy equipment for ZIBURIS to deploy against Dissident 1, whose art studio is based

in Southern California.

27.     On February 26, 2021, LIU asked ZIBURIS whether he had Dissident 1's

"credit card number & driving license."   ZIBURIS responded that he did not have "that

information about [Dissident 1]."   LIU directed ZIBURIS to "google which airport most close to

[Dissident 1's] Park or studio" and to "[f]ind out the cost for round trip."   After ZIBURIS sent

pricing of air travel to California, LIU thanked ZIBURIS and instructed him to check his email.

Later in the same conversation, LIU and ZIBURIS discussed the acquisition of a GPS monitor to

SEALED AND HSD

13

use against Dissident 1, including payment for the GPS monitor and how to expedite shipment of the GPS monitor to ZIBURIS.   LIU and ZIBURIS considered whether to have the GPS monitor shipped directly to California, where Dissident 1 resides.

28.   On February 27, 2021, ZIBURIS informed LIU that he had purchased the GPS monitor.   In response, LIU wrote, "Friday is the deadline we must report to boss [SUN], so you need two days follow him [Dissident 1], & last day talk to him buy latest one Apple [iPhone], you can order now."   The discussions revealed that LIU wanted ZIBURIS to use the phone to photograph Dissident 1; ZIBURIS later reported that he had purchased a "spy camera."

29.   On March 1, 2021, LIU asked ZIBURIS, "I gave you [Dissident 1's] birthday, you double check it's him?   How you can get [Dissident 1's] Mobil phone?"   He then instructed ZIBURIS to "Make sure [Dissident 1] & agent is there greeting you?   You try GPS device is good before you meet them[.]"   LIU then sent a photo of Dissident 1's bust sculpture depicting the COVID-19 coronavirus with the face of PRC President Xi Jinping and directed, "This is the most important one about Covid virus with head if state, you ask him [Dissident 1] stay next to it with agent & take photo of both[.]"   LIU sent ZIBURIS the address for Dissident 1's "main park" and indicated that "he has other park with more sculpture."

30.   On March 2, 2021, LIU and ZIBURIS discussed ZIBURIS's cover story for his meeting with Dissident 1.   At LIU's direction, ZIBURIS called an acquaintance who worked at a museum to see if she would respond to any phone calls from Dissident 1 to indicate that, in fact, ZIBURIS "is my broker looking good sculpture for our museum."   ZIBURIS indicated that the contact "says no way!   Says is issue of ethics.   As in I'm lying to get something for someone and she hang up on me[.]"   LIU then helped ZIBURIS design a fictitious business card suggesting that ZIBURIS is in fact an art dealer for ZIBURIS to present to Dissident 1.

SEALED AND HSD

14

31.     That same day, LIU sent ZIBURIS the personal identifying information belonging to an individual that LIU believed could be Dissident 1, including a date of birth, phone numbers and an address, as well as disposition information regarding a traffic violation.   I believe LIU likely obtained this information from somebody who conducted a search of public records for Dissident 1.   ZIBURIS confirmed that "[t]he last email is his correct information."

32.     Communications from March 3, 2021 suggest that ZIBURIS left Florida for California, where he would visit Dissident 1 while posing as an art broker.   LIU wrote, "I will give you points boss [SUN] want you say."   ZIBURIS responded, "Points?   Haha I'm a paid soldier.   Nothing stops me until mission complete!"   However, the text containing the "boss's" instructions appear to have been deleted from the chat, at the direction of LIU.   After the deleted messages, LIU wrote:

> second mission : boss [SUN] want you take a photo with [Dissident 1] & agent at the airport if he comes to pick up you , & next to sculpture of Covid Virus with President of Xi Jinping , 1 minutes video & photo , text to my what up for video & photo, to proof you are there with him."

> 3) when you sit down together have table meeting or lunch or dinner , they will ask your background & who your boss, you can say: my is very rich Jewish man & head of Jewish community, he Donate money to support few democratic presidents & speaker of house , especially Nancy Pelosi who is very strong support democracy!   Nancy want him to build up a democratic museum in NY or DC. That make him google & find out these sculptures are relate to democratic, for his ideal museum, that is why asking you go to see & negotiations

> Tell them your boss is low key rich man but don't want to explore his name, the deal structure is buy if he give good price , he is not Picaso , why so expensive? So you can let him explain each sculpture to you & you shooting for boss to let boss under[stand] why so much value ?

> When you taking you put phone in pocket open the reco[r]ding, when he show you & explain the sculpture, you tell them need to shooting for boss to understand why so much value

> 4) Boss [SUN] needs his house add & photo , how you can let him bring you?   Or just GPS to follow him & take photo outside?

SEALED AND HSD

Later that day, LIU wrote, "All his art about democratization, Nancy pelosi is the big democracy, so you mention your Jewish boss is the one help her win the vote, that [i]s why she want boss invest democracy museum[.]"

33.    Other communications between LIU and ZIBURIS in March and April 2021 reveal that LIU tasked ZIBURIS with installing a GPS device on Dissident 1's car and to purchase a drone device to surreptitiously videotape Dissident 1.   For example, on March 18, 2021, LIU wrote:

> Boss [SUN] say need smart GPS in two week at least , plus monitoring device under his steering wheel as you say ,   driving his car to your tank ,   it's most important mission you should finish by this afternoon,    The long from his gate to studio? Where & how you use Drones to follow him & without let him . . . know?   Since you have his house address, Maybe boss [SUN] just need you go to near his house to set up another camera, & let Drones fly over his house  & take one video to show boss how Drones works ?   Can you finish all these today ? & tonight you can fly back[.]

34.    The next day, on March 19, 2021, LIU wrote ZIBURIS that the "Boss" (SUN) wanted to review the video footage and look at the GPS data.   He further indicated that that the "boss" (SUN) had established an email account for reviewing the information.   Internet Protocol login information for that email account indicates repeated logins from Hong Kong, where SUN is located, as well as nearby Macao.   Additionally, information from a vehicle analytics data company confirms that, on or about March 15, 2021, ZIBURIS created a GPS and trip data account associated with Dissident 1's vehicle under Dissident 1's name.   Internet Protocol login information for the GPS account indicates repeated logins from Hong Kong, where SUN is located.

35.    The investigation has uncovered photos that appear to be screenshots of chats between ZIBURIS and Dissident 1's art agent, including repeated requests by ZIBURIS for videos of Dissident 1 and his art ("Boss just email me and would like small video of COVID head

and the mold he showed me on the ground with his translator") ("Lastly boss wants one more short video of [Dissident 1's] plans for the future.") ("Nice! Let me know when last video comes Boss likes others very much") ("Buyer interested in Covid head mostly.   He ask if he can see picture of the back") ("Buyer also ask to make video going around Covid head to not only see dimensions but explain its meaning more slow.   Said original video was going too fast.").   The discussions with the agent appeared to culminate in ZIBURIS's offer of $125,000 to rent the molds for the work, and the agent's refusal to accept the proposed terms.

36.   In the spring of 2021, Dissident 1's work depicting the COVID-19 virus was the subject of repeated vandalism; the final act of vandalism dismantled the sculpture and burned it to the ground, depicted below.   In connection with these acts of vandalism, the security cameras at Dissident 1's installations were found to be dismantled.



37.   The investigation has uncovered a series of undated documents that appear to be communications between LIU and SUN.   In these communications, LIU initially advocated against destroying Dissident 1's sculpture of the COVID-19 virus, but later advocated for

destroying the sculpture. In the first undated document uncovered by the investigation, LIU boasted in Chinese about his accomplishments for the "motherland" (which, based on the context of the investigation and the claims contained in the document, appears to refer to the PRC) and discussed "Projects that could work well for the motherland," including the planned harassment of Dissident 1 by publicly disseminating information about Dissident 1's purported tax liabilities, but not necessarily destroying the sculpture:[4]

> The recent statue incident investigation. Our team recommends not destroying things, because the person [Dissident 1] is still around. If it's destroyed, they will make a bigger fuss and report it to the police for follow up, further complicating things. Besides, it's equivalent to giving him wider notoriety because the boss [SUN] shelled out money for a publicity stunt for him. He can rebuild it and sell it to relevant departments in the U.S. government to make even more money. The best way to spend several tens of thousands and not investigate him any further. We know where his weakness is. Based on his high price quotes for his artwork, we believe he definitely took in a large sum and evaded taxes, a major crime in the U.S. After obtaining evidence, spend money for court and attorney fees to totally get rid of him.[2]

38. In another undated communication with LIU, SUN encouraged LIU to have ZIBURIS destroy the sculpture ("Destroy all sculptures and things that are not good to our leaders. (Record videos) Make the media promotion/propaganda clear"). In what appears to be a subsequent undated communication with SUN, LIU made a similar recommendation:

> First, we should take a 50% deposit and make preparations. Do a preliminary investigation; make detailed arrangements. Find where they are. Find out how many works are over there. And then, give the boss a price and buy their work. Buy the work that you hated the most. While destroying the work, video record it.
>
> Contact a couple of hundred media outlets in the United States and China to report the news and harshly criticize their disgusting act.

Notably, the investigation has revealed that LIU and ZIBURIS were in New York City at the same time that the COVID-19 sculpture was destroyed.

---

[4]     All translations are in draft form and subject to revision.

SEALED AND HSD

39.     In another undated document written in English uncovered by the investigation, ZIBURIS summarized some of his California-based activities as to Dissident 1:

> I have provided inside information about [Dissident 1], photos, interviews, license plate number, placed a GPS tracking device on his vehicle and given you full access to the GPS account. I have also provided several files on him and his properties and the address to his studio which is about a 10 minute drive from the Liberty Sculpture park to the East. I am also sending a secret recording of [Dissident 1] and his Agent talking during lunch. This was the only chance to make a recording because they kept watching me closely with my phone. Ill now send you the recording as well as other photos. The last thing you wanted is the videos from his agent of [Dissident 1] explaining each of his pieces.

40.     The investigation has revealed that ZIBURIS likely recognized the illegality of placing a GPS device on Dissident 1's vehicle.   In July 2021, ZIBURIS conducted the following Google searches, in additional to querying the Florida State statutes online: "are investigators allowed to put gps trackers on cars"; "Can a GPS Tracker Be Traced to Owner?"; and, "can you find out who owns a gps tracker on a car."   Notably, Florida Statutes, Title 47, Chapter 934, Section 425 criminalizes the installation of a tracking device or tracking software applications on another person's property without consent.

*Targeting of Dissident 2*

41.     In or about July 2021, LIU tasked ZIBURIS to perform surveillance on a prominent pro-democracy activist born in the PRC who resides in Indiana ("Dissident 2"). Based on this investigation, including open-source research, I know that Dissident 2 had already been the victim of a campaign of repeated on-line harassment prior to July 2021.   On or about July 10, 2021, LIU provided ZIBURIS with Dissident 2's date of birth, passport number, Twitter address, and multiple email addresses.

42.     On or about July 10, 2021, LIU provided ZIBURIS with the following taskings as to Dissident 2:

SEALED AND HSD
19

Research needs:

1. Identity information: naturalization? Do you have a green card? What way to get the green card? If there is no green card, master the reason for not obtaining green card;

2. Economic situation: sources of income, etc.;

3. The family situation, and the status of persons of key interest;

4. Pollution and poor tract: illegal and disciplinary circumstances, etc.

5. Other important cases not listed above. 6）SS # 7）car plate #

43.    On or about July 29, 2021, LIU tasked ZIBURIS with retaining a private investigator in Indiana to "put [a smart surveillance camera] in front of his [Dissident 2's] house, get one day photo & video report, let him quote how much, you add 50% as your profit."

44.    In a series of emails in early August 2021, ZIBURIS provided LIU with surveillance reports as to Dissident 2, including photos of Dissident 2's residence and a video of Dissident 2 being surveilled on a highway.   In an August 5, 2021 email, ZIBURIS wrote:

After he sped away from doing many turns and turn arounds he vanished.  He was driving so crazy that I wasn't able to get the camera on him after he did wild turn arounds.  Its like he either forgot something and didn't want to be late for something or he is just paranoid.

After a long time of searching for him I returned to his house and waited for a long time   No car was in his driveway but later he comes outside to check his mail, take a short walk  and water his grass.  He was constantly looking around like he was expecting something or was nervous.  So it looks like after his little drive he returned home and hid his car back in the garage.  I think that with what he does online and the speeches he gives that he probably earned some enemies and is extremely paranoid especially since all of his windows are blacked out and even at night you cant see any lights on in his house.

Neighbors are too close and lots of activity on his street so it wasn't wise to go look around his backyard.  I suggest a longer surveillance with the use of a Drone for his property and backyard since he may have windows not blacked out and could video and photo using the drone of the inside of his house.  I also suggest the use of a GPS Tracker to photo him easier when I see what his location is since he is paranoid, following him in a car isn't wise .  Using the tracker I can get photos and video of where he goes, what buildings etc, who he talks to and their vehicles as well.

SEALED AND HSD

45.     In addition to tasking ZIBURIS with investigating Dissident 2, LIU requested that the Investigator engage in the following conduct with regards to surveilling Dissident 2: conducting surveillance on the Dissident's home, taking photos and/or video of Dissident 2 and Dissident 2's family and luring Dissident 2 out of his home by posing as a delivery person.     LIU further requested that the Investigator find out whom Dissident 2 associates with, among other things.   The Investigator did not perform any of these tasks.

46.     On August 20, 2021, a member of law enforcement observed a coconspirator ("CC-1") parked across the street from Dissident 2's home in a Chevrolet with a Florida license plate.   On August 21, 2021, at approximately 6 p.m., an individual believed by law enforcement to be CC-1 was observed by Dissident 2's wife driving by Dissident 2's home and holding a cell phone in a manner that looked like he was recording members of Dissident 2's family who were outside Dissident 2's home.   On August 22, 2021, law enforcement agents performing surveillance observed CC-1 in the same Chevrolet parked in the vicinity of Dissident 2's house.   Law enforcement determined that this vehicle was owned by a car rental company and rented by CC-1.   According to records received from the car rental company, CC-1 rented the vehicle from August 20, 2021 through August 23, 2021 in Indianapolis, Indiana.

47.     More recently, LIU and ZIBURIS discussed approaching Dissident 2 under the guise of conducting a media interview with the goal of eliciting derogatory information about Dissident 2 and, in the process, installing surveillance equipment in Dissident 2's residence.   For example, in an email to LIU on October 18, 2021, ZIBURIS proposed "arriv[ing] at [Dissident 2's] location with media people and secret microphones and cameras to see about hiding them in or around his house.   The media people will not know about the secret microphones or cameras."   ZIBURIS added that he would "[c]onduct interview" of Dissident 2 "and see if its possible to place

SEALED AND HSD

cameras or if necessary I can come back after dark.   I need to see his security system.   I know he has at least one camera outside before I can determine if it is possible to place cameras then.   I will also attempt to put GPS Tracker on his vehicle."   ZIBURIS further indicated that he would later return to place cameras outside Dissident 2's house and outside the neighbors' houses and possibly "use the drone to conduct surveillance in his back yard and record as much as I can."   ZIBURIS indicated that he would "[f]ollow GPS tracker and take photos of where he goes and who he meets if possible."

48.     On the same date, LIU wrote to ZIBURIS instructing him not to approach Dissident 2 until he received further confirmation.   LIU indicated that "the Boss" (SUN) needed "more detail" and wanted to know how ZIBURIS would find a media group to act as cover for the operation.   LIU proposed the following cover story for the media group:

> [L]et them feel happy to co-operate with you since you will pay them some feel to produce a program as "The Democracy Hero of Chinese America in USA", their student can be report to get their credit[.]

In another email, LIU suggested that ZIBURIS use the following cover story: "Now you[r] best excuse is your boss [is] Ask Congress TV media who support by Nancy pelosi , will produce a program for some democracy hero in USA, and this program will send to Nancy to watch."

49.     Also on October 18, 2021, LIU forwarded ZIBURIS interview questions for Dissident 2 from the "boss" (SUN).   One of the proposed questions concerned Sino-U.S. relations and specifically "can China avoid the 'Great Flood' by fully turning to American values and institutions?"   The interview outline indicated that this question "is an ambush" meant to discredit Dissident 2, whether he reaches "the conclusion is 'Americanization can be avoided' or 'Americanization is also inevitable.'"   In either scenario, his statement "can be taken to make a fuss."   Similarly, the commentary for another question indicated that Dissident

SEALED AND HSD

2's answer could be disseminated in "video clips to promote, public opinion to expose and criticize."

*Targeting of Dissident 3*

50.     In communications with the Investigator in October 2021, LIU indicated that he had sent ZIBURIS to California to conduct unspecified activities with respect to a third anti-CCP pro-democracy dissident based in the Bay Area ("Dissident 3").

51.     On October 13, 2021, LIU instructed ZIBURIS that he had two objectives:

> 1) Mission one: Find out . . . more detail [on Dissident 3] besides his info in internet
> .
> His privacy , HIs SS #, His person mobil phone, his home address, how many house he has
> . . . .
> 2) Misson two : This guy you check him before and [the Investigator] sent someone to follow him and take some video as your team, you wrote report to boss [SUN]. Now you google below article he wrote and find out local city which media is interview him mostly, so that you can pay this media and go with this media to interview him 10 questions

ZIBURIS responded, "You know I don't care about who is the mission....boss [SUN] says go...then I see person as enemy Im hired to get information about."

52.     On October 14, 2021, ZIBURIS wrote to LIU that he could easily perform surveillance on Dissident 3: "Tell boss [SUN] I can do this job very easy, cameras and GPS on [Dissident 3], License plate number."   On October 20, 2021, ZIBURIS wrote LIU with a proposed plan of action for Dissident 3, whereby ZIBURIS would fly to San Francisco, California, place a GPS tracker on Dissident 3's vehicle, "[s]urveil him using the tracker and take photos and or video of where he goes and who he meets," and possibly "place hidden cameras to his front that will record who ever comes and goes."   ZIBURIS further indicated

**SEALED AND HSD**

23

that he would "[r]eport daily or when any event occurs of any discovery boss [SUN] may want to know asap." ZIBURIS asked to be paid $3700 for this project.

53.    While ZIBURIS was preparing to perform surveillance on Dissident 3, LIU repeatedly asked the Investigator for a copy of Dissident 3's passport. The Investigator indicated that he would consult with an unspecified partner who is a member of law enforcement. For example, on October 29, 2021, LIU wrote to the Investigator that "Matt" (ZIBURIS) would be flying "tomorrow afternoon," that is, on October 30, 2021, to San Francisco, California. LIU asked the Investigator when the Investigator would have ready a copy of Dissident 3's passport ("Could you get P copy in few days?" "Very happy to know you can get Passport info, need [a transfer of money through a digital payment application] now?"). He also appeared to ask for the passports of Dissident 3 and a family member of Dissident 3 ("If you could get both of their passport tomorrow, & S [social security] number of [Dissident 3's family member], could you send us tomorrow or today without waiting Matthew [ZIBURIS] arrive [in California]?"

54.    ZIBURIS attempted to dissuade LIU from using the Investigator's contacts at the IRS as a way of obtaining the social security numbers of Dissident 3 and Dissident 3's family member. On October 21, 2021, ZIBURIS wrote LIU:

> As for SS number, the [family member] is considered a Minor so finding [him/her] would be extremely difficult.
>
> You can ask [the Investigator] to get his contact to find his SSN but is it really worth it? [The Investigator] said that he has to ask a contact to find this information from the IRS. I suggest not doing this because he can only ask his contact so many times before his contact wont want to deal with him any more since what his contact has to do isn't legal. So I suggest to tell the boss [SUN] to only ask for SSN from [the Investigator] only when it is very very very important and not ask for someones SSN each and every time. Boss [SUN] has to realize that this isn't China where there is far more corruption than in the US.

SEALED AND HSD
24

And asking for this type of information from his contact who works for the Federal Govt, is technically committing a Federal crime where the punishments are very severe.

55.     After these communications summarized above, ZIBURIS traveled on two separate occasions to the Bay Area, ostensibly to perform surveillance on Dissident 3. During the first stay in the Bay Area, ZIBURIS commented to a clerk at the hotel where he was staying that he locates people for a living.   In recorded conversations with the Investigator during the same period, ZIBURIS confirmed that he had successfully located Dissident 3.   In one such recorded conversation on November 4, 2021, ZIBURIS and the Investigator spoke about ZIBURIS's understanding as to SUN's role in the scheme and LIU's apparent rush to obtain information regarding Dissident 3:

| The Investigator: | Well, this guy- let me ask you- do you think the rush comes from this- this guy- the boss you're talking about?  I mean, is this guy in America or is this guy in China? |
|---|---|
| ZIBURIS: | Uh, that actually, uh, I don't know.   I know they travel back and forth…but he- he [LIU] just calls him the boss because he's the treasurer, he's the one who authorizes funds to – |
| The Investigator | All the money and everything, alright. |
| ZIBURIS | Yeah, that (unintelligible)- so there- I mean, there is still a higher entity, it's just- he [LIU] just calls him [SUN] the boss. |

56.     The investigation has revealed that ZIBURIS planned to meet with Dissident 3 while posing as a member of an international sports committee (the "Committee"). On November 8, 2021, ZIBURIS wrote to LIU that his plan was to "drive to the house and ring doorbell.   Identify myself as [the Committee] and here to make sure all are travel ready . . . . I ask a series of questions including proof of non expired passports to show committee that they are prepared to travel."   The investigation has uncovered an identification card under the name

SEALED AND HSD

25

of a known Committee representative bearing ZIBURIS's image, as well as email correspondence between ZIBURIS and an online marketplace in which ZIBURIS attempted to persuade the online marketplace to produce "a replacement ID for this individual whom is coming back to the US to here in Florida."   ZIBURIS provided the following explanation to the online marketplace:

> This individual plays a crucial role and he needs this replacement ID. The department that makes the identification badges has been offline for technical issues and they are also located in Europe so I was tasked to find a way to get this persons replacement ASAP. I can't speak on behalf of the [the Committee]. I can only provide my business information and EIN since I'm technically a contractor. Be it known that the badge for this person is NOT official. Once this individual arrives and has the replacement he then has to take it to be hologram embossed as well as bar coded by a different entity. Just the badge alone will not grant this person access to anything related to the [the Committee] until the embossment and bar code is affixed. Technically the ID Badge is the template and not yet official and grants access to nothing.

57.    On November 16, 2021, ZIBURIS provided LIU with the following report on his efforts to perform surveillance on Dissident 3 and to obtain access to the passports of Dissident 3 and Dissident 3's family member:

> I called his work phone which I got no reply even though it's a cell phone he uses as his business phone.  So I then called his personal phone and spoke to him. I don't think he understood what I was saying so I repeated myself a couple of times and said that on behalf of the [Committee] we need to do a short interview with him . . . and he just say ok ok ok ok ok over and over and said to come to his house.

> I then waited a short while so he wouldn't know I was parked around the corner then I move the car so he could see it and went to speak to him.  I think he seen me through his window and he came outside asking who I was and why I was there. I told him I spoke to you on the phone about a brief interview.  He asked questions on why the interview and who do I work for etc.  I showed him the [Committee] Photo ID and said that the interview is a . . . Preparedness Check to make sure he and [his family member] were eligible for [international] travel.   I then said its just a few questions about Covid concerns, and how often they travel and things like this.   I said lastly that I just needed to check their passports to make sure they aren't expired and then Id report to the [Committee] that they were ok to travel.  I explained that it would only take 5 minutes or less.

He then said, NO!   Just make it stop!   I then explained to him that if I was sent
that it means the other 2 people who came to visit didn't report his information that
he and his [family member] are ok to travel.   If he don't cooperate then it could
delay or even deny you and [the family member for international travel].   He got
angry at me and said that no matter what that they will be going . . .   without my
interview and then told me to leave and not to come back and that he will call the
Committee himself in the morning.

Enclosed in the email were photographs ZIBURIS took of Dissident 3's home residence and

his office building.   Notably, the FBI understands that Dissident 3 was not at his residence at

the time when ZIBURIS claimed to LIU to have met with him.   It appears that ZIBURIS may

have lied or exaggerated to LIU about the taskings he performed as to Dissident 3.   However,

members of law enforcement did observe ZIBURIS visiting both Dissident 3's residence and

place of work during that trip to the Bay Area.

*Targeting of a Thailand-Based Chinese Dissident*

58.   The investigation has revealed that LIU also tasked ZIBURIS with

obtaining personal identifying information of another PRC dissident in Bangkok, Thailand.

On March 30, 2021, ZIBURIS wrote to a Bangkok-based private investigator seeking

information on "a business partner who is now in Bangkok," specifying that "[h]e is a Chinese

national who made his way to Bangkok as you can see."   After performing what appears to be

some open-source searches on the dissident, the private investigator responded that the

information ZIBURIS sought, including address, cell numbers, passport numbers, and social

media accounts, would require a subpoena.   The private investigator further warned ZIBURIS,

"If the subject is a communist party dissident, as implied in his Twitter bio, then we would need

to seriously consider the backstory and who we are being instructed by before accepting the

case.   Just to make clear that I am not a lawyer and I cannot provide you with legal advice."

ZIBURIS replied:

SEALED AND HSD

27

Regardless if the person is a dissident or not,  this person subsequently scammed, defrauded etc enough money from the company and corporations I represent to buy a small country.  We just need as much information as possible so our attorneys can work with our Thai attorneys and certain peoples of both courts to be legally served court orders to pay restitution or face imprisonment.

59.    Based on my knowledge of the investigation, I believe that ZIBURIS's representations regarding the Thailand-based dissident to the Bangkok-based investigator were false.   Additionally, based on my training and experience, I know that agents of the PRC frequently represent that their actions are related to legitimate business disputes or commercial litigation as a pretext to locate individuals whom the agents subsequently surveil, harass, and/or attempt to publicly discredit.

*Financial Benefit to LIU and ZIBURIS*

60.    The investigation has revealed that LIU and ZIBURIS have financially benefitted from their participation in the scheme under investigation.   The investigation has uncovered a series of chat communications between a coconspirator ("CC-2") and LIU in which CC-2 discusses, among other items, taking photographs and video recordings of the COVID-19 sculpture by Dissident 1 that was later destroyed.   In this chat conversation, LIU set forth an investigative plan and indicated the payment each team member could expect for surveilling Dissident 1, including obtaining his tax returns and personal identifying information:

1）    Ask the foreigner [ZIBURIS] to get all his information from the relevant parties：Please tell the boss [SUN]: when the investigation is finished, the report will include:
    1）    His current home address or business address, including his photos;
    2）    The price of his arts, and the number of arts that he has already completed;
    3）    The location of his studio;
    4）    Business or personal cellphone number;
** The asking price for the above-mentioned services: $10,000 + $10,000 for each of us;
    5）    His Social Security numbers;

SEALED AND HSD

28

** $10,000 for each of us (This is an extremely difficult job; we must use our connections with the FBI or police department to get it).

6)      His 2019 and 20   tax returns information;
** $5,000 + $5, 000 for each of us.

7)      Tracking, taking pictures, and video recording of his whereabouts for three days;
**Need a designated person for this job. The person wants $5,000 per day, plus $5,000 for each of us.

8)   Late stage process：  He is asking a ridiculously high price for his arts. He probably didn't pay that much taxes. Once we find evidence, we can work with the FBI, court, and law firm to file charges against him. There will so much fun!

**Estimated costs: $200,000.

Notably, the investigation has uncovered wire transfers to accounts associated with LIU, LIU's wife, and ZIBURIS that appear consistent with payments made for their services rendered in surveilling and harassing the U.S.-based dissidents. ZIBURIS appears to have earned more than $100,000, while accounts associated with LIU and LIU's spouse have received wire transfers from, among other accounts, certain Hong Kong-based accounts, in excess of $3 million.

WHEREFORE, your deponent respectfully requests that the defendants FAN "FRANK" LIU, MATTHEW ZIBURIS, and QIANG "JASON" SUN be dealt with according to law.

KEVIN PATRICK MINTON
Special Agent, Federal Bureau of Investigation

Sworn to before me this
9th day of March, 2022 *by telephone*

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK